```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,

 4              Plaintiff,
                                        HONORABLE PAUL D. BORMAN
 5
     v.                                 No. 00-80581
 6
     WAYNE WERTH,
 7
                Defendant.
 8   _____/

 9

10           SUPERVISED RELEASE VIOLATION HEARING

11                  Friday, May 15, 2009

12                      11:03 a.m.

13

     APPEARANCES:
14
        For the Plaintiff:      KATHRYN A. MCCARTHY
15                              U.S. Attorneys' Office
                                211 West Fort Street
16                              Suite 2001
                                Detroit, Michigan  48226
17                              (313) 226-9100

18
        For the Defendant:     CORBETT E. O'MEARA
19                             Law Offices of
                               Corbett Edge O'Meara
20                             500 Griswold
                               Suite 2340
21                             Detroit, Michigan  48226
                               (313) 625-6545
22

23

24           To Obtain Certified Transcript, Contact:
             Leann S. Lizza, CSR-3746, RPR, CRR, RMR
25                       (313) 965-7510
```

1                          **TABLE OF CONTENTS**

2    <u>Plaintiff's Case in Chief</u>                                <u>Page</u>

3      **William R. Fleming**

4        Direct Examination By Ms. Mccarthy                      7

5        Cross-Examination By Mr. O'Meara                       11

6

7

8    <u>Defendant's Case in Chief</u>                                <u>Page</u>

9      **Mark Wenglasz**

10       Direct Examination By Mr. O'Meara                      31

11     **Wayne Werth**

12       Direct Examination By Mr. O'Meara                      18

13       Cross-Examination By Ms. Mccarthy                      26

14       Redirect Examination By Mr. O'Meara                    29

15

16

17

18

19

20

21

22

23

24

25

1

2    Plaintiff's Exhibits

3      Number                                    Received

4    (None offered.)

5

6    Defendant's Exhibits

7      Number                                    Received

8     (None offered.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SUPERVISED RELEASE VIOLATION HEARING**            4

```
 1                                    May 15, 2009
 2                                    Detroit, Michigan
 3                          -    -    -
 4        (Call to order of the court, 11:03 a.m.)
 5        (Court, Counsel and Defendant present.)
 6             THE COURT CLERK:  *United States of America versus*
 7  *Wayne Werth*, 00-80581.
 8             THE COURT:  Parties please identify themselves for the
 9  record beginning with the government.
10             MS. MCCARTHY:  Kathryn McCarthy for the United States.
11             THE COURT:  Okay.  Thank you.
12             MR. O'MEARA:  Corbett --
13             THE COURT:  And for --
14             MR. O'MEARA:  Corbett O'Meara appearing on behalf of
15  the Defendant.  I apologize, Your Honor.
16             THE COURT:  Good morning, Mr. Werth.  Good morning.
17             THE DEFENDANT:  Good morning, sir.  Sir, I apologize
18  for being late.
19             THE COURT:  That's okay.  You're here.
20             Okay.  This is a hearing on the petition with regard
21  to supervised release violations.  First let me ask, because we
22  had the letter previously in the file, are you and your lawyer
23  getting along okay, Mr. Werth?
24             THE DEFENDANT:  Yes.
25             THE COURT:  Everything okay, Mr. O'Meara?
```

**USA v. WERTH, 00-80581**

SUPERVISED RELEASE VIOLATION HEARING                     5

1          MR. O'MEARA:  I believe so, Your Honor.

2          THE COURT:  Okay.  That takes care of that.

3          Okay.  Mr. O'Meara, why don't you and your client come

4     up to the podium just for a minute on the issue and then we'll

5     proceed with testimony, if necessary.

6          With regard to the petition for supervised release

7     violation, it lists two violation claims.  One is that there's

8     a violation of the condition that the Defendant shall not

9     possess a firearm, destructive device or other dangerous

10    weapon, and the second is a violation, Defendant is supposed to

11    notify the probation officer within 72 hours of being arrested

12    or questioned by a law enforcement officer.

13         Why don't we take the second one first.  It states

14    that your client, in February, did not timely contact the

15    probation officer within 72 hours after his arrest or police

16    contact.  How does your client wish to plead to that,

17    Mr. O'Meara?

18         MR. O'MEARA:  It is my belief that he wishes to accept

19    responsibility to plead guilty for that violation.

20         THE COURT:  Is that correct, sir?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  Okay.  The first one deals with the

23    question of possession of a firearm or other dangerous weapon,

24    and which he claims that on February 4th, 2009, that Mr. Werth

25    was observed at a bar and that he assaulted a person with a box

```
 1    cutter and fired a gun.  At a traffic stop, he was stopped and
 2    the passenger was wearing a bulletproof vest and carrying a
 3    Glock firearm.  Says that you had admitted to having a box
 4    cutter, denied having fired a gun, says the offender was
 5    observed by others firing a gun and FBI agents will testify to
 6    that information and that he told agents to protect himself,
 7    he'd have no problem slitting someone's throat or putting a gun
 8    in someone's mouth.  So what is your client's position with
 9    regard to that, Mr. O'Meara?
10            MR. O'MEARA:  He denies that he possessed or fired a
11    firearm that evening, Your Honor.
12            THE COURT:  Okay.  What about with regard to a box
13    cutter?
14            MR. O'MEARA:  I believe he will acknowledge that at a
15    point in time during the altercation, which he will acknowledge
16    engaging, he did have a box cutter.
17            THE COURT:  Is that correct?
18            THE DEFENDANT:  Yes, sir.
19            THE COURT:  Okay.  Why don't you have a seat for a
20    minute.
21            Miss McCarthy, with regard to the allegation contained
22    in violation number one, do you have any evidence that you wish
23    to proffer or submit through testimony of the Court with regard
24    to that violation?
25            MS. MCCARTHY:  Your Honor, I do have Special Agent
```

7

1    William Fleming here.  He's an agent of the FBI who did a

2    follow-up investigation.  He spoke with a witness in the case,

3    and he would be prepared to testify that the witness indicated

4    that Mr. Werth had a firearm at some point and discharged the

5    firearm.  That is the only evidence that I could present to the

6    Court.  It would be through the testimony of the special agent.

7    I don't have the witness here for a variety of reasons, Your

8    Honor.  We like to keep that witness' confidentiality.  So if

9    the Court is willing to accept the hearsay testimony of Special

10   Agent Fleming, I can certainly put that on.  I talked to

11   Mr. O'Meara.  I think he knows that that's what the government

12   would intend to prove this morning.

13        THE COURT:  Okay.  So basically the Special Agent

14   Fleming would testify that an individual -- well, why don't we

15   put him on the stand so Mr. O'Meara can cross-examine him on

16   that and I'll ask him a couple questions also, so that would

17   make it more formal.

18        Okay.  Special Agent Fleming, please.  Raise your

19   right hand.

20      (**William R. Fleming**, sworn, 11:08 a.m.)

21        THE COURT:  Okay.  Please take the witness stand.

22        MS. MCCARTHY:  Would the Court like me to --

23        THE COURT:  Yeah.

24        MS. MCCARTHY:  -- go through the direct?

25        THE COURT:  Yeah.

**FLEMING - DIRECT EXAM BY MS. MCCARTHY**

```
 1                        DIRECT EXAMINATION
 2   BY MS. MCCARTHY:
 3   Q.  State your name, please.
 4   A.  William R. Fleming, F-L-E-M-I-N-G.
 5   Q.  And how are you employed?
 6   A.  I'm an agent with the FBI assigned to the Macomb County
 7   office.
 8   Q.  And does that cover the area of Clinton Township?
 9   A.  It does.
10   Q.  And are you familiar with a location called the Lighthouse
11   Bar in Clinton Township?
12   A.  It's not in Clinton Township.  It's up in St. Clair County.
13   Q.  But you are familiar with --
14   A.  I am, yes.
15   Q.  -- the establishment?
16           Were you called on to investigate an incident that
17   occurred on or about February 14th of 2009?
18   A.  It was related to an investigation we were working on, yes.
19   Q.  And what was the nature of the investigation you were
20   working on?
21   A.  We were conducting an investigation into threats that a
22   witness in a particular case had received from members of a
23   local motorcycle gang.
24   Q.  And in connection with your investigation of the Lighthouse
25   Bar incident, are you familiar with an individual by the name
```

1    of Wayne Werth?

2    A.   I am.

3    Q.   And is he the Defendant seated here in court today?

4    A.   He is.

5    Q.   Did you speak with an individual about the incident that

6    occurred at the Lighthouse Bar?

7    A.   I did.

8    Q.   And what did that person tell you occurred?

9    A.   The person advised me that they had been at the Lighthouse

10   Bar when Mr. Werth and several other people entered the bar,

11   that there was basically a verbal altercation between one of

12   the people with Mr. Werth and eventually they went out to the

13   parking lot --

14   Q.   When you say they, who are we talking about?

15   A.   I'm sorry.  Mr. Werth, some of the people who were with

16   Mr. Werth and the person I'd call the victim.  And the victim

17   was attacked by several people.

18   Q.   Was one of those people Mr. Werth?

19   A.   Eventually it was, yes.

20   Q.   And can you describe -- were any weapons involved in the

21   altercation?

22   A.   There was a box cutter that Mr. Werth had that he swung at

23   the victim.

24   Q.   Any other weapons that you were told about?

25   A.   And later on the victim said that Mr. Werth retained a

FLEMING - DIRECT EXAM BY MS. MCCARTHY

1   firearm and fired it several times in the air.

2   Q.  Did the witness tell you where or how Mr. Werth obtained

3   the firearm?

4   A.  The witness did not have direct knowledge but was told that

5   Mr. Werth had obtained the firearm from one of the people that

6   he had come to the bar with.

7   Q.  Did you review other reports from other law enforcement

8   officers in connection with this incident?

9   A.  I did.

10  Q.  Did you learn that some point on February 14th, 2009, Wayne

11  Werth was stopped in a vehicle with another individual?

12  A.  He was.

13  Q.  Which department made the stop?

14  A.  I believe it was by Chesterfield and New Baltimore.

15  Q.  And do you know the name of the other individual with

16  Mr. Werth?

17  A.  Christopher Cook.

18  Q.  Do you know whether or not a firearm was found in that

19  vehicle or with one of the two occupants of the vehicle?

20  A.  It was.  A firearm was located on Christopher Cook.

21  Q.  And did he, in fact, have a permit, Mr. Cook?

22  A.  He did.  He had a CCW.

23  Q.  Did you have the opportunity to talk to Mr. Werth at any

24  point after this incident?

25  A.  We did, yes.

FLEMING - DIRECT EXAM BY MS. MCCARTHY

1  Q.  And when and where did that take place?

2  A.  It was several days after the incident.  We stopped by his

3  house, left a card and Mr. Werth called us back and agreed to

4  come to our office.

5  Q.  Did you ask him about the altercation?

6  A.  We did.

7  Q.  Did he admit his involvement in the altercation?

8  A.  He admitted his involvement in the altercation including

9  the box cutter but denied any involvement with the firearm.

10  Q.  When you say he admitted his involvement with the box

11  cutter, did he indicate how and in what manner he possessed the

12  box cutter?

13  A.  He did.  Prior to the whole altercation moving outside,

14  there had been some words between one of the people in

15  Mr. Werth's party and the victim.  Mr. Werth went out to his

16  truck and obtained a box cutter that he then carried on his

17  person.  When the altercation continued outside, he produced

18  that box cutter and then swung it at the victim several times.

19  Q.  Did he indicate whether or not he struck the victim with

20  the box cutter?

21  A.  He did not believe that he did, but he wasn't sure.

22          MS. MCCARTHY:  Thank you.  I have nothing else.

23          THE COURT:  Okay.  Cross-examine.

24          MR. O'MEARA:  Thank you, Your Honor.

25

```
 1                      CROSS-EXAMINATION
 2   BY MR. O'MEARA:
 3   Q.  Good morning, Agent Fleming.
 4   A.  Good morning.
 5   Q.  You are involved as an agent in other investigations which
 6   at least one of which might impact on this somehow, correct?
 7   Your focus with Mr. Werth is -- comes from being involved in
 8   another investigation, correct?
 9   A.  That's correct.
10   Q.  The only investigation you personally engaged in regarding
11   this incident in Jigger's Bar was the --
12            THE COURT:  Spell the name of the bar.
13            MR. O'MEARA:  I believe it's J-I-G-G-E-R, apostrophe,
14   S.
15            THE COURT:  Okay.  Thank you.
16   BY MR. O'MEARA:
17   Q.  Was the interview you had with the complainant, the
18   individual who claimed that he had been beaten up and
19   threatened with the box cutter and the --
20   A.  No, that's not true.  But the incident occurred at the
21   Lighthouse Tavern not at Jigger's Bar.
22   Q.  Oh, I'm sorry.  I apologize.  But you talked to other
23   people besides the complainant?
24   A.  That's correct.
25   Q.  Who else did you talk to?
```

**FLEMING - CROSS-EXAM BY MR. O'MEARA**

1    A.   I talked to Ronald Roberts who was with Mr. Werth,

2    attempted to talk to Mr. Cook, and we talked to several

3    employees at the bar.

4    Q.   Ronald Roberts acknowledged that he had been with -- he was

5    one of the people in the group with Mr. Werth that night,

6    correct?

7    A.   That's correct.

8    Q.   And he was -- he indicated to you that's the person who was

9    actually involved in the oral, the verbal altercation with the

10   complainant in the bar; is that correct?

11   A.   That's correct, but Mr. Werth was also involved in that.

12   Q.   And it was -- and but what Mr. Roberts told you was that

13   when he left the bar, he left the bar at some point, went down

14   to the parking lot, that the complainant left the bar after him

15   and that it was then his group of people followed out for

16   the -- whatever was going to go on in the parking lot, correct?

17   Mr. Roberts said that he left the bar, right?

18   A.   That's correct.

19   Q.   He said that the complainant followed him out of the bar?

20   A.   That's what Mr. Roberts said, correct.

21   Q.   And then Mr. Roberts also said that then his friend

22   followed the complainant out into the parking lot, correct?

23   A.   No.  I believe what Mr. Roberts says is the victim stepped

24   outside and that's when they became involved in their

25   altercation.  Regards to who was outside at that time, I don't

FLEMING - CROSS-EXAM BY MR. O'MEARA

1   know that he was clear or the victim was clear as to exactly

2   how many people were outside and who they were there with.

3   Q.  But both Roberts and the complainant are consistent that it

4   was initially a fight between the complainant and Roberts?

5   A.  That's correct.

6   Q.  And that Mr. Werth's involvement, whatever it was, came

7   either assisting Mr. Roberts or after the alter -- the physical

8   part of the altercation had begun?

9   A.  When they were outside, yes.  Mr. Werth did have some

10  involvement while they were inside.

11  Q.  Which was talking back and forth?

12  A.  It didn't involve talking.  Victim believed -- at one point

13  when Mr. Roberts and the victim were talking, Mr. Werth stood

14  behind the victim.  The victim thought that that was

15  intimidating.

16  Q.  I understand.  The only person who told you that Mr. Werth

17  had a gun was the person -- the complainant, correct?

18  A.  That's correct.

19  Q.  And the complainant is a person who is known to Mr. Werth,

20  correct?

21  A.  According to the victim, yes.

22  Q.  According to the complainant, he pressed charges against

23  Mr. Werth for an assault that he believed Mr. Werth had been

24  prosecuted and punished for almost ten years ago, correct?

25  A.  That's what he said, yes.

FLEMING - CROSS-EXAM BY MR. O'MEARA

1  Q.  So he acknowledges that he has a long history of antagonism

2  or being in opposition to Mr. Werth, correct?

3  A.  No, that's not what he acknowledges.  What he acknowledges

4  is that he was assaulted by Mr. Werth approximately ten years

5  ago, and that was the extent of it.

6  Q.  You also, as part of your investigation, reviewed the

7  police reports that were generated by the actual responding

8  deputies that night, correct?

9  A.  Yes.

10  Q.  And you're familiar with the fact that the -- in the

11  summary prepared by the investigating officers that night,

12  after interacting with Mr. Werth and Mr. Cook on the street,

13  the complainant at the bar, the actual witnesses at the bar,

14  their conclusion was that it is very possible that the weapon

15  did not get fired?

16  A.  No.  I don't believe that that's the conclusion that they

17  made.  I think their investigation did not locate any spent

18  shell casings.

19  Q.  Do you recall what the conclusion, the second to last

20  paragraph in the conclusory introductory -- I don't know that

21  I'd call it that but --

22       THE COURT:  I think your client wants to ask you a

23  question.

24       MR. O'MEARA:  I apologize.

25   (Short pause.)

1   BY MR. O'MEARA:

2   Q.  You have reviewed the incident report narrative that was

3   prepared by the deputies?

4   A.  I have, yes.

5   Q.  And do you recall what their conclusion was after they were

6   discussing, and it's on page five of nine of the reports that

7   they produced, that it was found out that nobody would get shot

8   at and it was very possible --

9           THE COURT:  Wait, wait.  See, when you read it, that's

10  fine, but Ms. Lizza has to take down every word, so why don't

11  you want -- start again with what the report states.

12          MS. MCCARTHY:  Your Honor, I have a copy of the

13  report, if the agent would like to refer to it.  I'm not sure

14  that he recalls it.

15          THE COURT:  Okay.  Do you want to give him a copy of

16  it?

17          MR. O'MEARA:  Could I approach?

18          THE COURT:  And then when you start reading that

19  portion again, when you get back to the podium, Mr. O'Meara, if

20  you'd just read it slowly.

21          MR. O'MEARA:  I will, Your Honor.  I apologize.

22  BY MR. O'MEARA:

23  Q.  It's actually highlighted on Miss McCarthy's version.  It's

24  the second highlighted sentence on that page.  Reading that and

25  I'll -- just for the record, I would state that I'm pointing

1  out a sentence where it says it was found out that nobody did

2  get shot and it was very possible that the weapon did not get

3  fired.  If that refreshes your recollection as to the

4  conclusions which were reached by the actual responding

5  officers that night.

6  A.  Well, that's what it says, that's correct.

7  Q.  And that is not contradicted anywhere else in the report by

8  the --

9  A.  Oh, I think it is because I think there's interviews with

10 other people who said they heard gunshots.

11 Q.  As to what the conclusions were.

12 A.  There's a conclusory statement there, but in --

13 self-contained in the report are statements of witnesses who

14 said they heard gunshots.

15 Q.  As well as witnesses who claimed they did not hear

16 gunshots?

17 A.  Correct.

18 Q.  There were no spent shell cases that were discovered in the

19 parking lot; is that correct?

20 A.  That's correct.

21         MR. O'MEARA:  I have nothing further, questions.

22 Thank you.

23         THE COURT:  Thank you.

24         Any redirect?

25         MS. MCCARTHY:  No.  Thank you.

18

```
 1              THE COURT:  Okay.  Thank you.  You may step down.
 2         (Witness excused, 11:20 a.m.)
 3              THE COURT:  Before we get to the argument on this --
 4    well, let's stay with this, so --
 5              MR. O'MEARA:  Your Honor?
 6              THE COURT:  Yes.
 7              MR. O'MEARA:  I do have one witness.
 8              THE COURT:  Pardon?
 9              MR. O'MEARA:  I have witnesses who are here.
10              THE COURT:  That's fine.  I just want to find out if
11    the government has any more witnesses.
12              MS. MCCARTHY:  We don't, Your Honor.  Thank you.
13              THE COURT:  Then, Mr. O'Meara, please call your
14    witness.
15              MR. O'MEARA:  Call Mr. Werth, please, Your Honor.
16              Approach him and raise your right hand.
17              THE COURT:  Come right over here.  Okay.  Raise your
18    right hand.
19         (**Wayne Werth**, sworn, 11:21 a.m.)
20              THE COURT:  Okay.  Please take the witness stand,
21    speak slowly and in a loud voice.
22                              DIRECT EXAMINATION
23    BY MR. O'MEARA:
24    Q.  Would you identify yourself for the record, please?
25    A.  Wayne Russell Werth.
```

1  Q.  And you're the Defendant in this case, correct?

2  A.  Yes, sir.

3  Q.  And you understand why you're here?

4  A.  Yes, sir.

5  Q.  Do you remember the night of February 4th, I believe, of

6  2009?

7  A.  Yes, sir.

8  Q.  Were you at the Lighthouse Tavern?

9  A.  Yes, sir.

10  Q.  Would you tell the Judge what happened.

11  A.  It was Valentine's Day --

12        THE COURT:  A little louder because Ms. Lizza has to

13  take it down.  Thank you.

14  A.  It was Valentine's Day.  I was asked to go there with a

15  young lady and her friend.  We're getting ready to go there.

16  Another person showed up.  Ronnie Roberts showed up.  We were

17  in separate cars.  Chris Cook came.  He came to the house.  He

18  drove in my truck.  We drove to the bar.  When we got in the

19  bar, Ronnie Roberts had trouble with -- I don't know.  I still

20  don't know his name --

21        THE COURT:  Wait a minute.  How many went to the bar,

22  just you and --

23        THE WITNESS:  Me and Chris and there was another car

24  where there was three girls and two guys.

25        THE COURT:  Okay.  Thank you.

WERTH - DIRECT EXAM BY MR. O'MEARA

1   A.  And then when we got to the bar, there was a big guy that

2   was kind of like pushing up on Ronnie and them two were

3   fighting each other off on then.  I walked behind --

4           THE COURT:  Wait.  You can see, we're talking, but

5   Ms. Lizza has to take it down, so speak slowly and louder.

6   This guy says?

7   A.  Ronnie and then -- what is his name?  I keep saying big

8   guy.

9   BY MR. O'MEARA:

10  Q.  We're calling him the complainant.  He's the guy who filed

11  the police report.

12  A.  The complainant.  Them two were having words and they

13  looked like they were getting ready to get into altercation.

14  So I came up behind Ronnie and said, "Forget about it," because

15  I mean the whole bar was filled with that guy and all his

16  friends.  "I don't want any trouble.  Let's get out of here."

17  They talked.  They worked it out.  I thought it was done.  I'm

18  sitting back at the table drinking water.  Five minutes later

19  Ronnie walks out the back door and here goes five of them this

20  way and the rest of the them go out this way --

21  Q.  By them --

22          THE COURT:  When you say this way, this way, one went

23  to the right, the four or five --

24          THE WITNESS:  Five of them went out the back door and

25  a bunch of them went out of the back door.

WERTH - DIRECT EXAM BY MR. O'MEARA

```
 1             THE COURT:  Thank you.
 2   BY MR. O'MEARA:
 3   Q.  When you say them, Mr. Werth, who do you mean by them?
 4   A.  The complainant's friends.  The whole bar was all his
 5   friends.
 6   Q.  What happened next?
 7   A.  When I came out the back door, Burby, the big guy, Burby,
 8   or the complainant, was coming up to Ronnie and saying, "You
 9   want to come down, MF'er?"
10             THE COURT:  You want to do what, sun down?  Wait.  The
11   big guy came out and said, "Do you want to --
12             THE WITNESS:  "You want something now, MF'er?"
13             THE COURT:  Now, MF'er.
14   A.  I'm not sure if he hit Ronnie or not.  There was two other
15   guys coming around the car.  At that point I chased them
16   around.  Them two ran.  And them two were in the altercation.
17   I got the big guy off and got him on the ground and stopped.
18   BY MR. O'MEARA:
19   Q.  Mr. Werth, what did you do in relationship to the big guy?
20   A.  I got him from Ron.
21   Q.  How did you do that?  You picked -- you're holding your
22   hands up.  You physically removed him from Ron?
23   A.  When I got him on the ground, I got him on the ground.
24   When he got up again, that's when I pulled up the box cutter.
25   By then they were everywhere.  You know what I mean?
```

1   Q.   What were you doing with the box cutter?

2   A.   All I want to do is go.  Waving it around.

3   Q.   Where did you get the box cutter?

4   A.   Out of my truck.

5   Q.   When did you get the box cutter out of your truck?

6   A.   Right after the altercation, after I made the stupid

7   decision to stay there.  I wanted to go and someone wanted to

8   stay.

9   Q.   Had the fight started already when you got the box cutter

10  or did you have it when you went into the bar?

11  A.   The fight had started already.  I had pulled the box cutter

12  out in self-defense.

13  Q.   Why did you have the box cutter in your car?

14  A.   The whole back of my truck is filled with tools.  I work

15  construction.

16  Q.   Did you have it prior to the fight?  Was your purpose in

17  having that box cutter in your truck so that you would have a

18  weapon if you need it?

19  A.   No, sir.

20  Q.   Was it because it's something you used working?

21  A.   Yes.  The officers, when they went through the back of the

22  truck, it was filled with generators, everything.

23  Q.   The people you were there with that night were Ron Roberts,

24  Chris Cook.  Who else?

25  A.   Amber Lang.

WERTH - DIRECT EXAM BY MR. O'MEARA

1          THE COURT:  Amber Lang?

2          THE WITNESS:  Amber Lang.

3          MR. O'MEARA:  It's L-A-N-G, I believe, Your Honor.

4          THE COURT:  Okay.

5  A.  And three of them I didn't know until later on.

6  BY MR. O'MEARA:

7  Q.  And you had other friends who were there at the bar that

8  evening, other people identified themselves to you since then

9  as being at the bar that evening?

10  A.  Yes.

11  Q.  Did you have a gun at any point that night?

12  A.  No, sir.

13  Q.  Did you know Chris Cook or any of the people you were with

14  had firearms that night?

15  A.  No, sir.

16  Q.  At what point did you become aware that anybody had a gun?

17  A.  I thought I heard a shot.  When we were outside, when I --

18          THE COURT:  When you tied what?

19          THE WITNESS:  When we're outside, everything got

20  crazy.  I said, "All I want to do is go."  I said, "Let's go."

21  Someone was yelling, "Let's get the rest of our people and go."

22  By that time my truck was parked like this --

23  BY MR. O'MEARA:

24  Q.  What do you mean?

25  A.  My truck was parked like this.  I'm in the back of my truck

24

1  like that.

2  Q.  You're indicating that you're behind your truck where your

3  truck is parked?

4  A.  Behind my truck.

5  Q.  And where is the fight compared to where you are at that

6  point?

7  A.  Up by the doors.

8  Q.  Which is about how many feet away from you?

9  A.  Probably, from here, further than that wall.

10  Q.  Maybe 25 yards?

11  A.  Further than that wall.  I said, "All I want to do is go,"

12  and that point in time I thought I did hear a shot, and whoever

13  fired that shot broke the whole scene up.  Whoever fired that

14  shot, I'd give them a kiss.

15  Q.  At that point everybody dispersed?

16  A.  Everybody dispersed.  Everything stopped.

17  Q.  Did you leave?

18  A.  Yes.

19  Q.  Who did you leave with?

20  A.  Chris.

21  Q.  You got pulled over by the police, correct?

22  A.  Right after we left.

23          THE COURT:  Speak slower, okay?

24  A.  Right after we left.

25  BY MR. O'MEARA:

25

1    Q.   And clearly.  It's very hard for me to do it as well.

2    A.   They followed us from the bar for about three miles.  They

3    followed right behind us and they pulled us over.

4    Q.   Were you aware during that period of time that Mr. Cook had

5    a gun?

6    A.   No, sir.

7    Q.   When did you become aware that Mr. Cook had a gun?

8    A.   When the other officers pulled me out of the truck and then

9    they pulled him out second and they asked him if he had a

10   weapon and then he lifted it up.

11   Q.   You're indicating that he lifted his arms up so his coat

12   came and that exposed --

13   A.   He said, "I do have a weapon."  I don't know what he said

14   it was and then ---

15   Q.   Was that the first time that you became aware that Mr. Cook

16   had a gun?

17   A.   That was the first time that I was aware he had it.

18   Q.   Did you possess the box cutter for the purpose of -- what

19   was your purpose in getting the box cutter, swiping it around?

20   A.   Self-defense.  I mean even the officers that night said it

21   was self-defense issue.

22   Q.   Did you acknowledge the police officers that night --

23   A.   Yes.

24   Q.   -- that you had pulled a box cutter out that night to try

25   to stop the fight?

WERTH - CROSS-EXAM BY MS. MCCARTHY

1   A.  Yes.  They concluded -- from what I understand, the officer

2   said to me he concluded that it was a self-defense issue just

3   like he concluded that the gun was never fired.

4   Q.  You know you have an obligation not to --

5   A.  Yes, I do.

6   Q.  Not to fail to report to the police?

7   A.  Yes, I do.  I'm guilty of that.

8   Q.  But when you did talk to the police that night, when you

9   talked to the police subsequent to that, have you sought to be

10  honest about what went on then?

11  A.  I've been honest, up front with everything.

12          MR. O'MEARA:  Thank you, Mr. Werth.

13          THE COURT:  Stick around, Mr. Werth.

14          THE WITNESS:  Sorry.

15          MS. MCCARTHY:  I just have a few questions.

16                  CROSS-EXAMINATION

17  BY MS. MCCARTHY:

18  Q.  Did you have an opportunity to go over the reporting

19  officer's report with your attorney, officers that stopped you

20  guys?  Did you take a look at that police report?

21  A.  When they said I possessed the weapon?

22  Q.  Yeah.

23  A.  That I had a CCW?

24  Q.  No, no, no.  No.  There is an error in this report.

25  Mr. O'Meara didn't go into it, but we agree that the report is

1    incorrect and that, clearly, it was Mr. Cook had the firearm at

2    the time of the stop as well as the CCW, as well as the

3    bulletproof vest.  It is noted in the report that it was you,

4    but we all agree that that's not correct.  But I'm just

5    wondering have you had a chance to review the police report?

6    It sounds like you have.

7    A.  I looked over it.

8    Q.  And did you notice in there that nowhere did the police say

9    you admit to having the box cutter at all?  That's not part of

10   that report?

11   A.  Well, I admitted it.  It was sitting right there on the

12   front seat and it stayed there and it was still there when I

13   left.

14   Q.  It's just an omission in the police report, as far as you

15   know?

16   A.  The box cutter was in the front seat.  I told him I pulled

17   it out.  I told him the whole incident.  Everybody gave the

18   same incident.  They concluded it was self-defense.  They

19   concluded the weapon was not fired.

20          THE COURT:  Okay.  She just asked about the box

21   cutter.

22   BY MS. MCCARTHY:

23   Q.  I just have a couple other questions about the box cutter.

24   There were -- Ronnie and the complainant had words in the bar;

25   is that right?

1    A.  Yes, ma'am.

2    Q.  At what point did you go out and get the box cutter?

3    A.  After the altercation was broke up, Ronnie wanted to stay

4    there.  I should have left.  That's where I messed up.

5           THE COURT:  You should have -- a little clearer and

6    louder.

7    A.  I should have left at that point in time, but I still did

8    not feel safe because the whole bar was filled with them.

9    BY MS. MCCARTHY:

10   Q.  And so it was at that point after the verbal exchange that

11   you went out to your truck and got the box cutter and brought

12   it back into the bar?

13   A.  Yes, ma'am.

14   Q.  In anticipation?

15   A.  In self-defense, just in case.

16   Q.  Was there any threat to you at that point other than the

17   words that had been exchanged in the bar?

18   A.  Well, other than ten or 15 guys looking kind of mean.

19   Q.  So you were in the bar in possession of the box cutter and

20   then when the fight moved -- or when the parties moved outside,

21   you went outside with the box cutter in anticipation of

22   self-defense?

23   A.  In anticipation of breaking up a fight.

24           MS. MCCARTHY:  I don't have anything else, Your Honor.

25           THE COURT:  Okay.  Any redirect?

```
 1              MR. O'MEARA:  Just very briefly.

 2                        REDIRECT EXAMINATION

 3   BY MR. O'MEARA:

 4   Q.  And this was when you --

 5              THE COURT:  Wait till you get to the podium before you

 6   start talking.

 7              MR. O'MEARA:  I'm sorry, Your Honor.

 8   BY MR. O'MEARA:

 9   Q.  And this is when you spoke with the FBI, but when you spoke

10   to Agent Fleming -- I'm not sure if it was Agent Fleming, but

11   when you spoke to the FBI agent, you told him you had a box

12   cutter?

13   A.  Yes, sir.

14              MR. O'MEARA:  Thank you very much.

15              THE WITNESS:  I didn't lie about nothing.

16              THE COURT:  You haven't what?

17              THE WITNESS:  I haven't lied about anything.  May I

18   mention something else?

19              THE COURT:  No, no.  Have a seat.  Talk to your

20   lawyer.  If he wants to put you back on the stand, I will allow

21   that.  So why don't you talk to your lawyer for a minute and

22   then --

23              MR. O'MEARA:  Your Honor, perhaps -- I do have a

24   whole -- I have seven people that I believe are in the hallway.

25              THE COURT:  Bring them on.
```

**WERTH - REDIRECT EXAM BY MR. O'MEARA**

1          MR. O'MEARA:  It may be that Miss McCarthy and I have

2     a couple minutes to talk --

3          THE COURT:  You might stipulate to something?

4          MR. O'MEARA:  We might be able to.

5          THE COURT:  When you come back, just list their names

6     for the record.  You want five minutes?

7          MR. O'MEARA:  That would be fine.

8          THE COURT:  We'll break for five minutes.  Let me ask

9     one question, you're still under your oath to tell the truth.

10    I just want to ask Mr. Werth one question.  Amber Lang, she

11    was -- is that your friend?

12         THE WITNESS:  She's an old friend of mine and we

13    became intimate.

14         THE COURT:  Okay.  She was the one with you at the bar

15    that night?

16         THE WITNESS:  Yes.  Yes, sir.

17         THE COURT:  Is she related to Cindy Lang, C-I-N-D-Y,

18    Lang?

19         THE WITNESS:  No, sir.

20         THE COURT:  Okay.  Thank you.  See you in five.

21         MR. O'MEARA:  Thank you.

22       (Court in recess, 11:34 a.m.)

23       (Back on the record at 11:41 a.m.)

24         THE COURT:  Okay.  Please proceed, Mr. O'Meara.

25         MR. O'MEARA:  Thank you, Your Honor.  I would like, at

```
 1   this point, to call at least one witness, Mr. Wenglasz.
 2          Could you, please, approach the judge.
 3          THE COURT:  Okay.  If you come right to the court
 4   reporter and spell your first name and last name.
 5          THE WITNESS:  Mark, M-A-R-K, Wenglasz,
 6   W-E-N-G-L-A-S-Z.
 7          THE COURT:  Okay.  Raise your right hand.
 8       (Mark Wenglasz, sworn, 11:41 a.m.)
 9          THE COURT:  Please take the witness chair, speak in a
10   loud voice and slowly.
11                      DIRECT EXAMINATION
12   BY MR. O'MEARA:
13   Q.  Could you please state your name for the record?
14   A.  Mark Wenglasz.
15   Q.  Were you at the Lighthouse Tavern on Valentine's Day of
16   this year?
17   A.  Yes.
18   Q.  What brought you to that bar that night?
19   A.  I'm good friends with the owner of the bar and we were just
20   out and about.
21   Q.  Are you familiar with this individual sitting here?
22   A.  Just from that night.
23   Q.  And are you familiar -- and I'm not sure if you're -- with
24   the person -- I'm not sure if the Court or anybody doesn't want
25   me to identify the complainant in this case.
```

```
 1              MS. MCCARTHY:  Doesn't matter.
 2    BY MR. O'MEARA:
 3    Q.  Do you know Danny Burby?
 4    A.  Yes, I do.
 5              THE COURT:  Is that spelled B-U-R-B-Y?
 6              MR. O'MEARA:  I believe it's B-E-Y, Your Honor.
 7              AGENT FLEMING:  B-U-R-B-Y.
 8              MR. O'MEARA:  Oh, is it?
 9    BY MR. O'MEARA:
10    Q.  How long have you known Mr. Burby?
11    A.  We went to high school together.
12    Q.  What's the nature of your relationship?
13    A.  Good, good friends.  Real good friends.
14    Q.  And you're probably in your late 30s or 40s?
15    A.  39.
16    Q.  So you've known him for about 20 years?
17    A.  Yes.
18    Q.  Was he at the bar that night?
19    A.  Yes, he was.
20    Q.  Do you know Mr. Werth's friends, the people he was at the
21    bar with that night?
22    A.  Yes, I do.
23    Q.  Like Ron Roberts.
24    A.  Ron Roberts is a good friend of mine also.
25    Q.  So between Ron Roberts and Danny Burby, is there a
```

WENGLASZ - DIRECT EXAM BY MR. O'MEARA

1   difference in how you hold these people?

2   A.  No.  I love them both like brothers.

3   Q.  You witness an altercation that went on that night?

4   A.  Yes.

5   Q.  Could you please tell the judge about the first unusual

6   incident that occurred?

7   A.  Well, I was in the bar.  I had a bunch of other friends

8   with me.  Dan Burby was there before we got there.  After that

9   Ronnie come in and I said hello to him, and then there was --

10  he went over to the bar and took Dan and --

11           THE COURT:  Wait.  He went over to the bar to Dan?

12           THE WITNESS:  Yes.

13           THE COURT:  Okay.  A little slower, a little louder.

14  A.  They started to talk, and it turned into an argument.

15  BY MR. O'MEARA:

16  Q.  Did it become more than a verbal argument while they were

17  inside the bar?

18  A.  No.

19  Q.  Did it end?  Did at some point their --

20  A.  You know, there was a time that nothing was going on.  They

21  were separated.

22  Q.  What happened next?

23  A.  My uncle was outside, and Ron went outside to talk to him

24  and -- because they're friends, and at that time Dan Burby come

25  out the back door and thought there was going to be another

```
 1   argument but the fists started flying.
 2            THE COURT:  Fists?
 3            THE WITNESS:  Yes.
 4            THE COURT:  The fists started flying.  And the uncle,
 5   what's his name?
 6            THE WITNESS:  Larry Davis.
 7            THE COURT:  Larry Davis.  Okay.
 8   BY MR. O'MEARA:
 9   Q.  What did -- after the argument inside the bar, the parties
10   separated.  You saw Ron Robert leave, you believe, to go talk
11   to your uncle?
12   A.  Correct.
13   Q.  And at that point you saw Mr. Burby leave the bar as well?
14   A.  Exactly.
15   Q.  Did he leave through the same door or different door?
16   A.  Same door.
17   Q.  Was that the back door?
18   A.  Yes, it was.
19   Q.  Did you then go to the back door in response to that?
20   A.  Yes, I did.
21   Q.  And you looked out into the parking lot?
22   A.  Yes, I did.
23   Q.  And what did you see?
24   A.  That's when I seen the altercation going on.  I mean my
25   first instinct was to try and go and break it up because I have
```

1  two friends fighting.

2          THE COURT:  Well, you're talking too fast.

3          THE WITNESS:  My first instinct was to try and break

4  it and because they're both friends of mine and you don't want

5  to see two friends of yours fight.

6  BY MR. O'MEARA:

7  Q.  What did you do?

8  A.  Because I'm friends of the owner of the bar, so I tried to

9  keep everybody inside as they were filtering in from the front

10 door and coming around the side of the building.

11 Q.  Do the front door and the back door both exit out into the

12 parking lot area?

13 A.  No.  The front door opens up to M-29, and there's a side

14 driveway that runs back to the parking lot.

15 Q.  Did you -- do you have an opinion or did you see -- or did

16 you see, I apologize, did you see how the actual physical fight

17 started?

18 A.  Didn't see it first started.  I was out there when it was

19 under way.

20 Q.  Did you see Mr. Werth at any point participate?

21 A.  Yes.

22 Q.  What did you see Mr. Werth do?

23 A.  All I seen was, like I said, I just seen fists flying when

24 there was other people that come out and that I also knew from

25 high school that were friends of Dan Burby's.  It just

WENGLASZ - DIRECT EXAM BY MR. O'MEARA

1   escalated from there.  I just keep people in the back door,

2   keep them from leaving the bar, so.

3   Q.  Did you see Mr. Werth, did you see his fist flying?  Did

4   you see him participating in the fight?

5   A.  Yes.

6   Q.  And did it appear to you to be -- describe -- was this a

7   group of people fighting an individual?  Was it two groups of

8   people fighting with each other?

9   A.  It turned out to be like a cluster.  Dan was with Ronnie

10  and then it turned and it was with him, and it just was chaos,

11  just running around going crazy.

12  Q.  Do you know whether or not -- did you ever see Mr. Werth

13  with a box cutter?

14  A.  No, I did not.

15  Q.  Do you know whether or not he had a box cutter that night?

16  A.  No, I do not.

17  Q.  Do you know whether or not shots were -- anybody fired a

18  gun or had a gun that night?

19  A.  Did not hear no gunshots, no.

20  Q.  Did you see the fight end?

21  A.  Yes.  Basically it was just two parties separated and --

22  Q.  Do you know where Mr. Werth was when the fight ended?

23  A.  Yes.

24  Q.  Where was he?

25  A.  In the middle of the parking lot.

WENGLASZ - DIRECT EXAM BY MR. O'MEARA

1    Q.   In the middle of the parking lot?

2    A.   Uh-huh.

3    Q.   When he engaged in the fight, when the fight ended?

4    A.   No.

5    Q.   Do you know what truck is his?

6    A.   No, I don't.

7    Q.   So you wouldn't know if he was by his truck or not?

8    A.   No.  Basically towards the back of the parking lot.

9            THE COURT:  They what?

10           THE WITNESS:  Basically, he was back towards the back

11   of the parking lot.

12           THE COURT:  Thank you.

13   BY MR. O'MEARA:

14   Q.   Do you -- between the two sides here, Mr. Burby's side and

15   Mr. Werth's side, are you here on behalf, with any particular

16   bias or --

17   A.   Nope.  I'm just here to tell the truth.  Like I said, I'm

18   friends with both sides.

19   Q.   Do you know him well enough to lie for him?

20   A.   No.

21           MR. O'MEARA:  Thank you, Mr. Wenglasz.

22           MS. MCCARTHY:  No questions.  Thank you.

23           THE COURT:  Thank you, sir.  You may step down.

24       (Witness excused, 11:48 a.m.)

25           MR. O'MEARA:  Your Honor, I think we can stipulate to

1 a significant amount of the rest of the proposed testimony

2 including --

3        THE COURT:  Okay.  Do it slowly.

4        MR. O'MEARA:  That if I re-called Mr. Werth, Mr. Werth

5 would testify that when he was pulled over by the, I believe,

6 St. Clair County deputies, he asked them to perform a gunshot

7 residue test on his hands to prove he hadn't fired a gun.

8 That's what he would testify to.

9        THE COURT:  Any objection?

10        MS. MCCARTHY:  No.  I agree that's what he would

11 testify to.

12        THE WITNESS:  I also ask --

13        THE COURT:  Wait.  You got to talk to your lawyer.

14        MR. O'MEARA:  I apologize.

15        THE COURT:  Either call you or proffer.

16        MR. O'MEARA:  And that he would also testify that he

17 asked Agent Fleming to -- gunshot residue of his hands.

18        THE COURT:  Wait.  That --

19        MR. O'MEARA:  That Mr. Werth to testify that when he

20 was interviewed by Detective -- Agent Fleming, he also asked

21 Detective Fleming to perform gunshot residue tests on his

22 hands.

23        THE COURT:  Special Agent Fleming.

24        MR. O'MEARA:  The stipulation is that that's what he

25 would testify to, unless what we've just agreed is true.

**SUPERVISED RELEASE VIOLATION HEARING**

```
1            MS. MCCARTHY:  I don't object to that either.

2            THE COURT:  Okay.

3            MR. O'MEARA:  Mr. Ron Roberts would testify that he

4   participated in a fight with Danny Burby after having gone to

5   the Lighthouse Tavern in a group with Mr. Werth, that it was a

6   fight that Mr. Burby started and that at no point did he -- he

7   heard a loud noise.  At the end of the fight Mr. Werth was back

8   by his truck, but he never saw Mr. Werth with a gun.  That's

9   what Mr. Roberts would testify to.  Kristen Bell, who is -- was

10  not a friend.

11           THE COURT:  That is a -- with a --

12           MR. O'MEARA:  It's K-R-I-S-T-E-N B-E-L-L.

13           THE COURT:  Okay.

14           MR. O'MEARA:  Who would testify that she was, at the

15  time, not a friend of Mr. Werth's and was simply in the bar,

16  witnessed a fight inside the bar and did not hear any

17  gunshots -- witnessed the altercation inside the bar, did not

18  witness the fight outside the bar but did not hear any

19  gunshots.  Christopher Cook would testify that he was with

20  Wayne Werth that night, that the fight -- that the altercation

21  inside the bar took place as Mr. Werth testified to, that there

22  was a fight outside of the bar, that Mr. Cook was armed with

23  the legal registered pistol for which he had a CCW permit.

24  Mr. Cook has indicated to me that if he was asked a question

25  under oath did he take his firearm into a place that sold
```

**USA v. WERTH, 00-80581**

1    alcohol, he would want to take the Fifth Amendment, and if he

2    was asked --

3         THE COURT:  That's not an issue here as to whether he

4    took the --

5         MR. O'MEARA:  He has not answered for me whether or

6    not he took the gun into the bar.

7         THE COURT:  Right.

8         MR. O'MEARA:  He has not answered for me whether or

9    not he fired the gun out in the parking lot.

10        THE COURT:  Okay.

11        MR. O'MEARA:  Karen Drozdowski, K-A-R-E-N

12   D-R-O-Z-D-O-W-S-K-I, and Randy Drozdowski, spelled the same

13   way, would testify that they are -- that they were present at

14   the Lighthouse Tavern, that they witnessed an altercation

15   inside the bar which was consistent with what Mr. Werth

16   described, that they witnessed some parts of fights outside of

17   the bar, that they did not hear gunshots and that Mr. Werth was

18   back by his truck when the fight broke up, that he was not a

19   participant in the fight when the fight broke up.

20        Amber Lang, which is A-M-B-E-R L-A-N-G, would testify

21   that she was there as Mr. Werth's date, I believe, was there

22   with Mr. Werth, saw the fight inside the bar but did not go

23   outside and did not hear any gunshots.

24        And I believe, if I could consult with Mr. Werth for

25   one moment, that would be the extent of the testimony if we

### SUPERVISED RELEASE VIOLATION HEARING

1    called these witnesses live.

2            THE COURT:  Sure.

3      (Short pause.)

4            MR. O'MEARA:  After consulting with Mr. Werth, Your

5    Honor, I have no witnesses to call and would rest on that

6    evidence.

7            THE COURT:  Okay.  Thank you.

8            MR. O'MEARA:  Thank you.

9            THE COURT:  Does the government wish to present any

10   rebuttal testimony?

11           MS. MCCARTHY:  No, Your Honor.

12           THE COURT:  Okay.  The Court has before it the

13   testimony from the hearing that we've just held.  On the

14   question of violation of mandatory condition number one, which

15   is the Defendant shall not possess a firearm or other dangerous

16   weapon, in this case the testimony was that the Defendant did

17   go grab a box cutter and lashed out at someone, didn't hit

18   anyone, appears, which is good.  But a box cutter in that

19   situation is a dangerous weapon.  The Court does not find that

20   there is sufficient testimony -- or evidence bearing indicia of

21   reliability that would allow it to conclude that he did possess

22   a firearm.  But a box cutter is a dangerous weapon.  And so I

23   do find that there is a violation of mandatory condition one.

24           Why don't you and your client come up to the podium

25   and let's talk about where we go from here.  I have gotten a

1   lot of letters and a lot of things that talk about the school

2   that he states that he is attending.  So, Mr. O'Meara, if you

3   would help us get an understanding of what Mr. Werth is

4   presently doing within the community relating to his situation,

5   that would be helpful.  And I have received a lot of letters

6   both from Mr. Werth and from family.  But right now what I'm

7   looking at is the Learning Institute, ICR, all capital letters,

8   Learning Institute where Mr. Werth indicates that he is

9   attending that and then maybe you can help us out on.

10          MR. O'MEARA:  Your Honor, I'm not certain which

11  documents you and Agent -- or Officer Kosmas have been

12  provided, but Mr. Werth has, since he's met with Miss Kosmas,

13  begun -- actually enrolled, started school in the hopes that he

14  would be able to continue.

15          THE COURT:  I have this --

16          THE DEFENDANT:  Yes.

17          THE COURT:  And that indicates.

18          THE DEFENDANT:  Since then I have enrolled.

19          THE COURT:  You have enrolled.

20          THE DEFENDANT:  Yes, sir.

21          MR. O'MEARA:  It is through a grant or loan program

22  through Michigan Works.  That's the -- besides the fact that he

23  has been, as I understand it, prior to this time for a

24  significant period of time compliant with the terms of his

25  supervised release and has been, obviously, very participatory

43

```
 1   with Officer Kosmas that he stays in touch.  He is seeking to
 2   get trained in robotics.  It does seem like, obviously, getting
 3   into a fight, something it's -- they teach you in law school
 4   you can't bring a knife to a fist fight.  He brought a knife to
 5   a fist fight.  It is, obviously, a very serious violation of
 6   the conditions of his supervised release.
 7            THE COURT:  Let me ask, the ICR training program, have
 8   you gone to any classes yet?
 9            THE DEFENDANT:  Yes, sir.  I started Monday.  Student
10   pass.
11            THE COURT:  Okay.  How long does it last, sir?
12            THE DEFENDANT:  This one's till --
13            THE COURT:  Is it July 4th?  3rd?  Something like
14   that.
15            THE DEFENDANT:  No, it started later.  It started a
16   week later.  We just started Monday, so.
17            MR. O'MEARA:  The form says the end date is -- but
18   it's a two-month program ended July 4th.
19            THE DEFENDANT:  But we started a week late.
20            MR. O'MEARA:  If it started a week later, it would end
21   July 10th.
22            THE DEFENDANT:  Also had --
23            THE COURT:  When you speak, you got to speak slowly
24   and loud so Ms. Lizza can take it all down.
25            THE DEFENDANT:  I'm sorry.
```

 1          THE COURT:  It also has you or she also has you in the

 2    program.

 3          THE DEFENDANT:  She has me -- there's a troubleshooter

 4    there who works at ICR and she has me on a field trip release

 5    of liability.  Whenever there's a problem at a facility, I can

 6    go with them and he trains me to troubleshoot as well, and

 7    she's doing that on the side as -- may I ask a question?  Do

 8    you have the letter that my -- that I gave you that my future

 9    boss wrote?

10          THE COURT:  We got a lot of letters.  Her file -- what

11    is your future boss's name?  That will help.

12          THE DEFENDANT:  Dennis Winder.

13          THE COURT:  Spell his last name.

14          THE DEFENDANT:  W-I-N-D-E-R.

15          THE COURT:  Okay.  Give us a minute.  See if we can

16    find it.  We have something from Kristen Bell, B-E-L-L.  Let me

17    look here.

18          MS. KOSMAS:  Here.

19          MR. O'MEARA:  Could I approach, Your Honor?

20          THE COURT:  Hold on.  I may have it.

21          MR. O'MEARA:  It seems to have Exotic Robotics, Inc.

22    as the letterhead, Your Honor.

23          THE COURT:  Yes.  I have it right here.  Is this what

24    it looks like?

25          MR. O'MEARA:  That is, Your Honor.

1    THE COURT:  I have that in front of me.  It's a letter

2  not dated from Mr. -- who's last name W-I-N-D-E-R, Exotic

3  Robotics in Fraser and it's undated, but it obviously was

4  written after April 20th.  And so go ahead with regard to that.

5    THE DEFENDANT:  Yeah.  Well, while I was still

6  incarcerated, he had advised me -- I didn't know what I was

7  going to do when I got out.  He says -- I told him I was going

8  to Kentucky.  He said, "Enroll in some kind of robotic program,

9  and when you come back, I'll give you a job."  So I enrolled in

10  Louisville Tech down there for approximately 18 months, and

11  after I learned all the required classes, I came back up.  The

12  industry was -- I'm sure you know Chrysler's bankrupt and

13  everything.  And there was two robots that I needed to learn,

14  the Fanuc and the ABB.

15    THE COURT:  You got to spell the first one.  ABB is a

16  company.  And Fanuc you said?

17    THE DEFENDANT:  F-A-N-U-C.

18    THE COURT:  F-A-N-U-C.

19    THE DEFENDANT:  And a Kawasaki (phonetic) I need to

20  learn too.  Them two robots, since the industry went bad, he

21  could only send one person on each side.  You know what I mean?

22  Maybe two.  And at the point a few months ago, it was going to

23  be where he could put me on the job site where I could still

24  get training from the guys there because --

25    THE COURT:  Let's deal with one thing at a time.

46

1   Right now you're in a class to teach you robotics.

2          THE DEFENDANT:  Yes, to learn the Fanuc and ABB, yes.

3          THE COURT:  Class ends July 10th, sort of right around

4   there.

5          THE DEFENDANT:  Yes.

6          THE COURT:  After that you hope to get a job from

7   Mr. Winder or somebody else.

8          THE DEFENDANT:  Mr. Winder is quite positive that I

9   have a job.

10          THE COURT:  Okay.

11          THE DEFENDANT:  And that's what I've been striving for

12   up until that one night.

13          THE COURT:  Okay.  Where you living?

14          THE DEFENDANT:  I live with my mother right now.

15          THE COURT:  Okay.  So right now you're not working.

16   You're going to school.

17          THE DEFENDANT:  I work on -- I'm going to start

18   working on the weekends painting.

19          THE COURT:  Painting.

20          THE DEFENDANT:  Hopefully this weekend I can start.

21          THE COURT:  Anything you want to add further,

22   Mr. O'Meara?

23          MR. O'MEARA:  Just that -- well, that Mr. Werth has

24   just pointed out to me that he has successfully completed the

25   anger --

SUPERVISED RELEASE VIOLATION HEARING

 1          THE DEFENDANT:  I want --

 2          MR. O'MEARA:  -- or he wants to be enrolled in anger

 3   management.  That's something that was suggested by

 4   Miss Kosmas.  Just that I don't think I've ever had a client

 5   who was as -- it amazes me that he violated the supervised

 6   release because he is, obviously, very, very, very conscious of

 7   his obligations to the Court and the court processes.  He has

 8   been very involved.  And he's been consistent.  The testimony

 9   he gave this morning was exactly what he told me in confidence.

10   It's what he told Miss Studnicki, who represented him before

11   me.  He has never backed away from what the Court has found

12   that he did wrong and has been ready to acknowledge those

13   things, that he had a box cutter, that he was there at the

14   wrong place at the wrong time, that he didn't tell the police

15   that he had had contact.  He has been very, very critical.

16   He's also felt somewhat aggrieved because he contends, as the

17   Court found, that he did not have a gun, at least the Court

18   found that there was not sufficient evidence.  He was not

19   drinking that night, left the fight.  All the evidence is he

20   left the fight.  And I think that even the most serious

21   allegation is that somebody -- if he did fire the gun, it was

22   fired to break up the fight.

23          THE COURT:  What I'm going to do is adjourn the

24   hearing, in terms of the supervised release violation, as to

25   what I'm going to do for 60 days, to allow him to finish the

### SUPERVISED RELEASE VIOLATION HEARING

1    school.  I'm going to require that he have anger management and

2    mental health counseling.  I'm also going to ask for a urine

3    test today.  Adjourn it for 60 days.

4           In the meantime, you're staying out of bars.

5           THE DEFENDANT:  Yes, I am.

6           THE COURT:  No drinking or drugs.  If you stay out of

7    trouble, then the 60 days will last.  If you get in trouble,

8    we'll see you here real soon.  Do you understand that?

9           THE DEFENDANT:  Yes.

10          THE COURT:  First, let me ask Miss McCarthy, anything

11   you want to say?

12          MS. MCCARTHY:  No, I have nothing else to add, Judge.

13          THE COURT:  Do you want to object to it?

14          MS. MCCARTHY:  No.

15          THE COURT:  Miss Kosmas?

16          MS. KOSMAS:  Yes, Your Honor.  Probation is concerned

17   that Mr. Werth know that he cannot leave the Eastern District

18   of Michigan.

19          THE COURT:  That's right.

20          THE DEFENDANT:  Yes.

21          THE COURT:  No trips.

22          MS. KOSMAS:  And if he is going to be working, we

23   would like verification that you are lawfully working at an

24   occupation.

25          THE COURT:  Right.

SUPERVISED RELEASE VIOLATION HEARING

1          MS. KOSMAS:  And not working under the table, being

2     cash money, that I cannot verify.

3          MR. O'MEARA:  But even if he is a non -- an employer

4     that's not issuing him a paycheck, as long as he acknowledges

5     to the government that he received that money, it's legitimate.

6          THE COURT:  What about if he's painting on the

7     weekends and they give him $100 for a day of painting?  I guess

8     we should just know whose house he painted or --

9          THE DEFENDANT:  I've got like --

10         THE COURT:  Okay.

11         MR. O'MEARA:  And that he's reporting all income that

12    he receives.

13         THE COURT:  So he'll report it to you, keep a list so

14    you don't say, "I don't know who gave me the money."  Okay,

15    Mr. Werth?

16         THE DEFENDANT:  Yes.

17         THE COURT:  You keep a list of whose house, which

18    store.

19         MS. KOSMAS:  My other concern is he has prescriptions

20    for Vicodin, and I would like him to ask his doctor to take a

21    different type of --

22         THE COURT:  Yeah.  Vicodin is famous.  I get a lot of

23    cases involving people using -- it's a very, very hard, severe

24    drug.  I know you're limping, but go see your doctor, and

25    there's other things that aren't as crazy impacting as Vicodin.

SUPERVISED RELEASE VIOLATION HEARING

```
 1          THE DEFENDANT:  I've been on Naprosyn.  I've had three
 2    shots in my back.  I've been on Motrin.  I've been on a list of
 3    things.  Nothing works.
 4          MS. KOSMAS:  Then I would like proof from his doctor
 5    that he needs to be on that medicine or there is no other
 6    medicine that is a non-narcotic that will benefit him.
 7          THE DEFENDANT:  Okay.
 8          THE COURT:  Get a letter from your doctor and we'll
 9    check it out when we get it, okay, on the issue of Vicodin.
10          THE DEFENDANT:  Okay.
11          THE COURT:  Because that's crazy stuff, and it,
12    obviously, it has medical purposes, but it's usually operative
13    and things like that, and I think they don't want you to run
14    machines when you're on the Vicodin, do things like that.
15          THE DEFENDANT:  I don't.
16          THE COURT:  I don't know how you would be able to take
17    the Vicodin and do the robotics training.  It wouldn't be
18    healthy.
19          THE DEFENDANT:  I take them at night.
20          THE COURT:  Thank you all.  We'll see you in 60 and
21    not sooner, but we'll be here if we need to see you sooner.
22          THE COURT CLERK:  July 16th at 3:00.
23          THE COURT:  July 16th at 3:00 p.m.
24          MR. O'MEARA:  Thank you, Miss Goodine.  Thank you,
25    Your Honor.
```

USA v. WERTH, 00-80581

1          THE COURT:  Thank you.  Very good.

2      (Proceedings concluded, 12:06 p.m.)

3                    -    -    -

4

5    I, Leann S. Lizza, do hereby certify that the above-entitled

6  matter was taken before me at the time and place hereinbefore

7  set forth; that the proceedings were duly recorded by me

8  stenographically and reduced to computer transcription; that

9  this is a true, full and correct transcript of my stenographic

10 notes so taken; and that I am not related to, nor of counsel to

11 either party, nor interested in the event of this cause.

12

13

14 S/Leann S. Lizza                            4-10-12
   _____

15 Leann S. Lizza, CSR-3746, RPR, CRR, RMR        Date

16

17

18

19

20

21

22

23

24

25